STATE, USE OLIVER, Adm'r, vs. ROTTAKEN, Adm'r, et al.

1. ADMINISTRATOR *de bonis non: His right on bond of predecessor.*
An administrator *de bonis non* has no right to sue the representative or sureties of a former administrator or executor, at law, or in equity, for property of his intestate, lost, wasted, mismanaged or converted by him. Only creditors, legatees, distributees, or others interested in the estate, can maintain such action.

2. ADMINISTRATOR PUBLIC : *Rights of, same as other administrator.*
A public administrator has no more or greater power, authority or rights, than other administrators.

3. ADMINISTRATOR : *Action on bond of deceased for waste, etc.*
No action can be maintained on the bond of a deceased administrator for assets of his intestate on hand and capable of identification at his death, nor for waste and mismanagement thereof after his death.

4. AMENDMENT: *When not made.*
Where a plaintiff shows in his complaint that he has no cause of action, the court can not amend it by making others plaintiffs who have.

APPEAL from *Pulaski* Chancery Court.

Hon. J. R. EAKIN, Chancellor.

Before Mr. Justice HARRISON, and Hon. JESSE TURNER and Hon. B. B. BATTLE, Sp. JJ.,—Mr. Chief Justice ENGLISH and Mr. Justice EAKIN being disqualified.

*Brown,* for appellant.

*Rose, contra.*

BATTLE, Sp. J. This is an action in chancery, brought by the state of Arkansas for the use and benefit of William S. Oliver, as public administrator of the estate of David Skelton, deceased, against H. H. Rottaken, as public administrator of the estate of John T. Trigg, deceased, and Charles Ayliff and Claiborne Watkins, as the residuary divisee of the estate of George C. Watkins, deceased.

The appellant, in her complaint, states that John T. Trigg was duly appointed administrator of the estate of David Skelton, deceased, in the year 1855, by the probate court of Pulaski county; that Trigg qualified as such administrator, and executed his bond to the state of Arkansas, in the sum of nine thousand dollars, with George C. Watkins and Charles Ayliff as sureties thereon, and conditioned as required by law; and that said bond was approved as good and sufficient.

That on the twenty-eighth day of October, 1858, Trigg filed his account current, showing a balance of fifteen hundred and seventy-one dollars and twenty-five cents due the estate of Skelton; and that this account current was approved and confirmed by the probate court, at the April term thereof, in the year 1859.

That Trigg died in the year 1863, without making a final settlement or paying the balance aforesaid, or any part thereof; that Thomas Fletcher, public administrator of Pulaski county, administered on the estate of Trigg, and as such public administrator filed a partial settlement of Trigg as administrator of Skelton, showing the same balance due the estate of Skelton as shown by Trigg; that this settlement was confirmed by the probate court, at the April term thereof, in the year 1868, and Fletcher, as such administrator, was, at his request, discharged.

That William S. Oliver was appointed administrator of

Skelton, by the probate court, on the twenty-fourth day of October, 1871.

That George C. Watkins died in the year 1873, leaving a last will and testament whereby he bequeathed and devised the whole of his estate to Claiborne Watkins, charged with the payment of his debts and certain legacies, and appointed Claiborne Watkins executor thereof; that said will was proven, and admitted to probate by the probate court of Pulaski county, in the manner prescribed by law ; and that Claiborne Watkins qualified as such executor, and took upon himself the execution of the will, and paid all of said debts exhibited to him, properly authenticated, within two years after the date of his letters testamentary, together with said legacies.

That George C. Watkins left property amply sufficient to pay all his debts and said legacies ; and that after the payment of the same, a very large and valuable estate was received, and is now held and enjoyed by Claiborne Watkins under the provisions of the will, especially the property described in said complaint.

That at the April term, 1875, of the Pulaski probate court, H. H. Rottaken was appointed administrator of the estate of Trigg, and as such administrator was ordered by said court to pay to Oliver, as administrator of the estate of Skelton, the said sum of fifteen hundred and seventy-one dollars and twenty-five cents, and interest thereon for fifteen years, amounting in the aggregate to the sum of two thousand, nine hundred and eighty-five dollars and thirty-eight cents; that Oliver afterward demanded payment thereof, when Rottaken refused to pay the same, saying he had no assets with which to pay it; that Oliver, as administrator of Skelton, made out an account of his said demand, verified by his oath, and in

June, 1875, presented it to Claiborne Watkins, as executor of the last will and testament of George C. Watkins, deceased, and he refused to pay the same.

That said claim did not mature and become demandable until after the expiration of two years next after the date of said letters testamentary; that the same is barred, as against said executor; and plaintiff's only remedy is in equity against the devisee of Watkins.

The prayer of the complaint is, that said demand be declared a lien upon the property devised to Claiborne Watkins, which is described in the complaint; and that plaintiff, for the use of Oliver as such administrator, have judgment for the amount of such demand, against defendants, and for other relief.

The defendant, Claiborne Watkins, demurred to the complaint, because there is no equity therein; because the claim was barred by the statute of limitation and nonclaim; and because it appears on the face thereof that the court below had not jurisdiction of the subject-matter of the action. The demurrer was sustained as to so much thereof as says there is no equity in the action, and was overruled as to the other causes assigned.

Plaintiff, with leave of the court, filed an amendment to her complaint, and therein stated that Skelton left surviving him, at his death, eight children, heirs and distributees—their names; and when they respectively arrived at the age of twenty-one years; that while they were minors their mother moved with them from the state of Arkansas, and from thence hitherto they have been non-residents of this state; that no assets of the estate of Trigg ever came to the hands or possession of Rottaken; and asked that Skelton's heirs be made and considered parties plaintiffs, joining in the further prose-

cution of this action, and renewed the prayer of the original complaint.

Defendant, Watkins, demurred to the amended complaint, because the facts stated therein are not sufficient to constitute a cause of action. The demurrer was sustained, and the plaintiff declining to amend further, the complaint was dismissed; judgment for costs was rendered in favor of defendants against plaintiff; and plaintiff excepted and appealed.

The complaint and amendment thereto fail to show that any part of the assets received by Trigg remained in specie at the time of his death, or were capable of being ascertained and identified as the specific property and estate of Skelton. But, on the contrary, it is alleged that a balance of fifteen hundred and seventy-one dollars and twenty-five cents was due the estate of Skelton at the filing of Trigg's last settlement, and that no part thereof has ever been paid. How and on what account this balance became due, plaintiff fails to explain. The only reasonable conclusion which can be drawn from the complaint and amendment is, it was due and owing by Trigg on account of assets of the estate of Skelton lost, wasted or converted by him, in his lifetime. If the conclusion be correct, does the amended complaint show that plaintiff has or had a cause of action against the defendants or either of them?

It is said, that by the old law of England the king was entitled to seize upon the goods of all intestates as the *parens patriae*, and general trustee of the kingdom. This prerogative he exercised for some time by his own ministers of justice. Afterwards the crown, in favor of the church, invested the prelates with this branch of the prerogative. The goods of intestates were given to the ordinary by the crown; and he had the right to seize them,

and keep them without wasting, and also might give them, alien, or sell them at his will, and dispose of the money *in pios usus.* For the discharge of this trust the prelates were only accountable to God and their own consciences. This trust they abused most outrageously, and in the name of the church and the poor, the whole residue of the deceased's estate, after the *partes rationabiles* of the wife and child were deducted, took unto themselves, without paying even his lawful debts, or other charges thereon. To check this exorbitant power, entrusted with ordinaries, it was enacted by the Statute of Westminister 2 (*13 Edwr., 1 C., 19*), that the ordinary should pay the debts of the intestate, so far as his goods would extend. But this statute did not afford adequate relief. After the payment of the debts there was very often left a *residuum* to be used as the ordinaries might see fit to apply. This power they used in a most iniquitous manner, and thereby caused parliament, by the *Statute 31, Edwr. III, C., 11,* to further enact, that in case of intestacy, the ordinary should depute the nearest and most lawful friends of the deceased to administer his goods ; and thereby gave origin to administrators, who, before this statute, were unknown to the laws of England.

Under the *Statute 31, Edwr. III,* an administrator became the deputy of the ordinary, and clothed with all the authority and power which the ordinary previously had in the administration of estates. The legal title to the personal estate of his intestate vested in him. He had the power to alter, change or convert any portion thereof to his own use, and such portion was thereby fully administered, and became a part of his estate, and descended to his legal representatives. But inasmuch as he held in *autre droit*, and, therefore, had no right to dispose, by will, of the property which remained in specie at his death, it

still remaining the property and estate of his intestate, it resulted back to the ordinary to appoint a receiver. So, too, when an executor died intestate, his administrator did not become the representative of his testator, but, as in case of the deceased administrator, it became the duty of the ordinary to appoint an administrator of the testator with the will annexed. In both cases, the appointment of an administrator was for the purpose of completing an administration already begun. It was not, as in case of the first administrator, a full and immediate administration of the "goods, chattels and credits, which were of the testator or intestate at the time of his death," but an administration *de bonis non administratis.* The commission of the second administrator only vested him with the power and authority, and imposed upon him the duty of collecting and administering "such property and effects of the deceased, not administered by the former representative, as remained in specie, and were capable of being ascertained and identified as the specific property or estate represented by him." To this extent, only, did his power, authority and duty extend. He could not sue the former executor or administrator, or his sureties, on his executorial or administration bond, in law or equity, for property wasted, lost, altered or converted by the first executor or administrator. Such liability of the former executor or administrator, or his sureties, was no part of the estate of the testator or intestate, on which the administrator *de bonis non* had a right to administer, but was "a chose in action belonging to those entitled to the estate as creditors, legatees, or distributees." In such cases the creditors, legatees or distributees only, were authorized to sue. *Finn et al. v. Hempstead et al,, 24 Ark., 117; Coleman v. McMurdo, 5 Rand., 51; Potts et al. v. Smith, 3 Rawle, 360; Warfield v. Brand's*

*Adm'r, 13 Bush. (Ky.), 77; Beal v. New Mexico, 16 Wallace, 540; 3 Redfield on the Law of Wills, star page 103; 1 Lomax on Executors, marginal pages, 335–339; 1 Williams on Executors, marg. pages, 822–827; 4 Bacon's Abr., 24.*

In equity, the executor or administrator holds the property of his testator or intestate, in trust for the benefit of those concerned, first for the benefit of the creditors, and then for the legatees, or, in case of intestacy, for the distributees under the statute of distributions. And the assets are treated and regarded as a trust fund, "to be administered by the executor," or administrator, " for the benefit of all persons who are interested in it, whether they are creditors, legatees or distributees, or otherwise interested, according to their relative priorities, privileges and equities." For the benefit and at the instance of those interested, only, will a court of equity interfere to protect the trust funds, and hold the executor, or administrator, or his legal representative and sureties, accountable for waste and mismanagement of the same, and cause it to be administered or disposed of according to their relative priorities, rights, interests, privileges and equities. (*1 Story's Eq., secs. 532, 579, 580*). As we have already seen, the administrator *de bonis non* can not, and does not, stand in the relation of *cestui que trust* to the trust fund; nor does the executor or administrator hold the same in trust for his use and benefit. His commission gives him a right which is purely of a legal nature, and which extends only to so much of the goods, chattels and credits as remains in specie, and can be identified as the specific property or estate of the deceased. Hence, it follows that he has no right to institute suit, in a court of equity, to hold the representative or sureties of a former executor or administrator accountable for property

lost, wasted, mismanaged or converted by such former executor or administrator.

The power, authority and duties of an administrator *de bonis non* remain and are the same in this state as we have already seen they were under the common law of England and statutes of the British parliament, unless they have been changed by statute. Have they been changed? They have not. It is true that *sec. 44 of Gantt's Digest* says: "If any executor or administrator die or resign, or his letters be revoked, he, or his legal representatives, shall account for, pay, and deliver to his successor, or the surviving or remaining executor, all money and personal property, and all the rights, credits, deeds, evidence of debt, and papers of any kind belonging to the estate of the deceased, at such time and in such manner as the court shall order; and such court, in case of a refusal to comply with such order, shall have power to enforce the same by attachment." But what money, personal property, rights, credits, deeds, evidence of debt and papers are referred to in this section? Manifestly, such as remains in specie. The former executor or administrator, or his legal representative, could not account for, pay and deliver to his successor any other assets. No other assets belong to the estate of the deceased. And it would be absurd to require and force him by attachment to account for, pay over and deliver to his successor something which had ceased to exist, and was beyond his reach and control. He could not be forced by attachment; and it would be impossible for him to account for, pay over, 'and deliver to his successor any assets other than those in specie, and capable of being identified as the specific property or estate of the deceased. It could not be any money which the deceased administrator was liable to pay on account of assets lost, wasted, or converted by him; for the same stat-

utes expressly provide how demands and claims for money against the estates of deceased persons shall be authenticated, presented, classed, and paid, and that, too, in a way and manner entirely different from that provided for the payment and delivery of assets under sec. 44 cited above.

Instead of giving the administrator *de bonis non* the right to sue on the bond of a former administrator, and recover any amount for which he may be liable on account of any waste or mismanagement of the estate of the deceased, *sec. 191 of Gantt's Digest*, on the contrary, expressly provides: " The bond of *any* executor or administrator may be sued on at the instance of any legatee, distributee, creditor, or other person *interested*, in the name of the state, to the use of such legatee, distributee, creditor, or other person interested, for any mismanagement, waste, or other breach of the condition of such bond; and the party to whose use suit is brought, shall have judgment against the executor or administrator, and his securities, for the *whole value of the estate mismanaged or wasted,* with costs of suit; and the amount so recovered shall be distributed by the court in the same manner as if the same had been accounted for by the executor or administrator." This statute in no wise changes the remedies in the cases therein provided for, but substantially re-enacts the law which was in force in such cases at the time of its enactment, and thereby perpetuates it in every material point. Under it, the administrator *de bonis non* has no authority to sue, because he has not, and from the nature of the case could not have, an interest in the assets wasted or mismanaged, or the liability therefor, as we have already seen.

But has Oliver, as public administrator, greater power and authority and more rights than he would have if he had been regularly appointed administrator *de bonis non* of

State, use Oliver, Adm'r, vs. Rottaken, Adm'r, et al.

the estate of Skelton? What are the powers, authority and duties of a public administrator, as defined by the statute? The statutes make it his duty to take charge of all the estates of every kind, of the deceased persons in his county, in certain enumerated cases, and to "institute all manner of suits that may be necessary to recover the property, debts, papers or other estate of the deceased, *in the same manner as if letters of administration were actually granted to him.*" If property comes into his hands, he is required to enter into the like bond and security as is prescribed in cases of administrators in ordinary cases, and to make true and perfect inventory thereof, "and administer and account for the same as near as circumstances will permit, *according to the law prescribing the duties of administrators*, subject to the control and direction of the court." "He holds the estate until an executor or administrator is regularly appointed, when, under the order of the court, he is required to account for, pay and deliver to such executor or administrator all the money, property and estate of every kind in his possession. He is required to act as a temporary administrator for the preservation of the estates of deceased persons in his county, liable to be wasted, injured or lost; and to bring suits for the recovery of the estate in the same manner he would do if letters of administration were actually granted to him. No statute or law, other than those governing administrators, define his power and authority, and prescribe his duties as to the estates in his charge. The same law which defines the power and authority and prescribes the duties of administrators is made applicable to him. There is no statute giving him greater power and authority than is granted to administrators regularly appointed, or giving him power to administer any more or other goods,

chattels, rights and effects, than an administrator of the same estate, regularly appointed, would have. Hence it follows that Oliver, as public administrator, had no more or greater power, authority and rights than he would have if he had been regularly appointed administrator *de bonis non;* and that he only fills the place of an administrator *de bonis non pro tempore,* and until an administrator *de bonis non* shall be regularly appointed. *Gantt's Digest, sec. 216, 223.*

Plaintiff alleges in her complaint that Oliver was appointed administrator of the estate of Skelton, on the twenty-fourth day of October, 1871. Taking it for granted that the appointment was valid, he thereby became the administrator *de bonis non* of Skelton's estate, and thereafter had no right to sue or recover any assets of the estate of Skelton, in his capacity of public administrator; and in such capacity could not maintain this action. *Gantt's Digest, sec. 220.*

Could or can an action be instituted and maintained on the bond of Trigg for assets of the estate of Skelton, which were received and held by Trigg while he was administrator, and were on hand at his death, and capable of being ascertained and identified as such assets, or for damages suffered by reason of the waste and mismanagement thereof since his death ? Certainly not. Section 44, cited above, makes it the duty of the executor or administrator, when his administration terminates in his lifetime, to account for, pay, and deliver the assets remaining in specie, under the order of the probate court, to his successor; and in the event he dies before he is discharged or removed, it makes it the duty of his legal representative to account for, pay and deliver so much of the assets as remain in specie and were capable of being identified

and ascertained, in like manner, to such successor. His legal representative is required to give bond for the faithful discharge of his duties, one of which, nominated in the bond, is, he shall, "well and truly, do and perform all other matters and things touching" his administration, "that are or may be prescribed by law, or enjoined" on him "by the lawful order, sentence or decree of any court having competent jurisdiction." One of the duties appertaining to his administration, prescribed by law, is, to account for, pay, and deliver to such successor the assets belonging to the estate of the deceased, represented by his testator or intestate, in his lifetime, and remaining in specie, when thereunto required by the probate court. If he fails to do so, he is liable to a suit on his executorial or administration bond. On the other hand, if the administration of the first executor or administrator terminates in his lifetime, it is his duty to account for, pay, and deliver to his successor such assets, under order of the court; and if he fails to do so, is liable to an action on his bond. Section 45 says: "The succeeding administrator or the remaining executor may proceed at law against the *delinquent and his securities*, or either of them, or any other person *having in his possession any part of the estate.*" What delinquent is referred to in this section? Manifestly he who failed to deliver assets in obedience to the order of the court, as prescribed by section 44, just preceding. If the first administrator be dead, the delinquent and securities referred to could not be the first administrator and his securities, because no action could be brought against him. As to the assets remaining in specie at his death, he could not be considered a delinquent, because the law assumes no jurisdiction of a dead man, and requires nothing of him. His sureties have no right, and it is not

their duty, to take charge and control of the assets, and they are powerless to prevent waste thereof. It is his legal representative who is required to account for and deliver the assets remaining in specie, under the order of the court; and if he fails to do so, he is the delinquent, and his sureties are the securities authorized to be sued by section 45. If the assets have been lost, wasted or converted by the deceased administrator in his lifetime, the creditors, legatees, distributees or other persons interested, are alone authorized to sue on the bond of the first executor or administrator, and not his successor. Sections 44, 45 and 191, stand as a part of one and the same act of the legislature, and should be construed together. From them, construed as a whole, the conclusion that suit can not be brought on the bond of a deceased administrator by his successor, for assets remaining in specie at the time of his death, or for damages suffered by reason of the waste and mismanagement thereof since his death, is unavoidable.

Plaintiff, in the amendment to her complaint, asked that the heirs and distributees of Skelton be joined and considered as plaintiffs in this action. These heirs and distributees, so far as shown by the transcript of the record here, did not appear and ask to be made parties, and were not made parties. Did plaintiff have the right to amend by making them parties? The Code says: "The court may, at any time, in furtherance of justice, and on such terms as may be proper, amend any pleading or proceeding by adding or striking out the name of any party." This provision of the Code assumes that the plaintiff has a cause of action, and does not authorize the court in any case, where the plaintiff has failed to show any cause of action, to amend by adding the name of a party in whose favor a cause of

action is shown by the complaint to exist, because such a proceeding would be practically instituting a new action, and forcing a party, at the instance of one who has no right to demand it, to commence an action when he does not wish to do so. Broad and liberal as the provisions of the statute of amendments are, we see no authority in them for such a proceeding. *Pomeroy's Remedies and Remedial Rights*, sec. 420; 4 *Waite's Practice*, 655; *Van Syckels v. Perry, 3 Rob.* (*N. Y.*), 621; *Davis v. The Mayor, etc., of New York, 14 N. Y. (4 Kern.), 506; Van Duzer v. Howe, 21 N. Y. (7 Smith), 531.*

We, therefore, conclude that plaintiff's complaint and amendment thereto, under any construction that may or can be placed thereon, fail to state facts sufficient to constitute a cause of action; that the demurrer thereto was properly sustained; and that there is no error in the proceedings of the court below.

Let the decree of the court below be in all things affirmed.